JOHN T. DWANE, Respondent, v. EDMOND WEIL and Others, Copartners Doing Business under the Firm Name of ALPHONSE WEIL & BROS., Appellants.

First Department, February 10, 1922.

Sales — theory of c. i. f. contract — action by assignee of buyer against seller for repayment of purchase price of goods lost by ocean carrier — evidence establishing strict c. i. f. contract — waiver by buyer of strict compliance with contract as to delivery of documents of title — full performance on part of seller by delivery of goods to carrier and obtaining bills of lading and insurance — remedy of plaintiff or assignor is against carrier — accord and satisfaction not effected by delivery by defendant to plaintiff's assignor of order or direction to carrier to make payment for loss — provision of contract that goods should be weighed at port of arrival had no bearing on delivery of goods — written provisions in blank form of contract are controlling over inconsistent printed provisions.

The theory of a c. i. f. contract is that it constitutes a sale of goods by delivery not of goods but of documents, viz., a bill of lading, invoice and policy or certificate of insurance, and that it is incumbent upon the seller to deliver or to tender delivery of them to the buyer within a reasonable time after the date agreed upon for the shipment of the goods, and that on performance of that duty by the seller it becomes the duty of the buyer to accept the documents which will entitle him to receive the goods if they arrive, and to enforce any claim of liability there may be either against the carrier or the insurer, and, therefore, in such cases it becomes immaterial in whom the title was, either at the time of or prior to the delivery or tender of delivery of the documents, and it likewise becomes immaterial whether the goods have been lost in transit before or are so lost after the delivery or tender of delivery of the documents.

In an action to recover the purchase price paid by plaintiff's assignor for part of goods sold by the defendants to the plaintiff's assignor and lost while in possession of the French Line as ocean carrier after delivery thereto at Havre, France, and before delivery at New York, held, on all the evidence, that the agreement for the purchase and sale was intended as a strict c. i. f. contract, and that the assignor waived a strict compliance therewith as to the delivery of documents of title, and that, therefore, the defendants fully performed their obligations when the goods were delivered to the carrier and the bills of lading therefor and the insurance thereon were obtained, and they were ready, able and willing to deliver the same to the assignor, for in such circumstances the provisions of the Personal Property Law, sections 100 and 101, which would

otherwise apply, are not applicable, and the assignor or the plaintiff must look solely to the French Line under the bills of lading for redress.

The mere delivery by the defendants to the assignor of an order or direction to the French Line to make payment for the loss, which was not accepted, did not constitute an accord and satisfaction of any claim the assignor had against the defendants.

It was immaterial that the contract contained a provision guaranteeing a minimum shrinkage in weight of the goods when weighed upon arrival at New York as, according to the custom of the business, that clause had no bearing on the delivery of the goods.

It was likewise immaterial that the contract contained provisions inconsistent with its being a strict c. i. f. contract, as the only inconsistent provisions were printed and the other material provisions were typewritten on the blank contract form, and the rule is well settled in such cases that the written provisions where inconsistent with the printed provisions supersede such printed provisions and are controlling.

APPEAL by the defendants, Edmond Weil and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 24th day of December, 1920, upon the decision of the court rendered after a trial at the New York Trial Term, a jury having been waived.

*Putney, Twombly & Putney* [*Henry B. Twombly* of counsel; *Frank Paine Reilly* and *Edward B. Twombly* with him on the brief], for the appellants.

*Hill, Lockwood & Redfield* [*Dominic B. Griffen* of counsel; *Robert L. Redfield* with him on the brief], for the respondent.

LAUGHLIN, J.:

This action is on an assigned claim of the E. C. Mills Leather Company, a Massachusetts corporation, and is predicated on a contract, evidenced by a written confirmation by defendants under date of March 13, 1917, and a formal acceptance thereof by the assignor, for the sale of 18,000 green calfskins by defendants to the assignor and is brought to recover the purchase price paid by the assignor for part of the hides which were lost while in the possession of the French Line as the ocean carrier after delivery thereof to it at the port of Havre, France, and before it delivered the hides to the assignor at New York.

Defendants were engaged in business in the cities of New

York and Paris as dealers in hides under the firm name of Alphonse Weil & Bros. They claim the benefit of the general rule of law applicable to sales on c. i. f. terms by which the buyer assumes all risk of loss after delivery of the goods to the carrier. That claim is predicated on the fact that the contract, after stating the numbers, quality, different grades and purchase prices of the skins, provides as follows: " all 6 /12 lbs., average 9–1 /2–10 lbs., c. i. f. New York, invoice weight, shrinkage guaranteed not to exceed 5 per cent. when reweighed on dock on arrival in N. Y. Seconds, if any, at 15¢ less per skin." The contract provided that the skins were to be shipped at once from France and that payment was to be secured by and made under a letter of credit at ninety days sight in favor of Messrs. Alphonse Weil & Freres, the name of defendants' French house, Paris, for $112,000. It was further provided in the contract as follows:

" Remarks: We are not responsible for any delay in arrival of vessel or vessels carrying these goods. If same should be lost, this contract to be null and void so far as regards any undelivered portion. This contract to be void so far as any undelivered portion . or its entirety is concerned if delivery or deliveries are prevented by war, revolution, blockade, strikes, prohibition of export and /or other causes of force majeure and /or consequences thereof or any unforeseen circumstances beyond our control. No claim under this contract can be recognized, unless made within 10 days after arrival, and, in case of disagreement, same to be settled amicably, or, failing so, by arbitration. In no case can the goods be left for sellers account."

It was not shown in the testimony or stated in the points or on the argument whether in making the contract a printed blank was used; but deeming that this might be important we sent for and examined the contract introduced in evidence; and it appears thereby that a printed blank bearing the letterhead of the defendants was used, and that all material provisions of the contract preceding the paragraph headed, " Remarks " was in typewriting written on the blank, and that the word " Remarks " and the paragraph following, which has been quoted, were printed.

It is to be borne in mind that the contract was made when France, from which the skins were to be shipped, was engaged in the World War, so called, and pending the declaration of war by the United States of America. Defendants claim to have delivered the goods to the assignor by two shipments. The first consisted of the delivery of 931 bundles of skins by the defendants to Ramsay's Foreign Service, which was a forwarding company, at Paris on the 15th of March, 1917, from which they received Ramsay's shipping receipt or bill of lading, acknowledging prepayment of insurance and freight charges to New York. The forwarding company agreed to forward the skins to the port of Havre and to deliver the same on board a French Line steamer appointed to sail for New York and to make delivery in good order and condition at the port of New York " unto Messrs. Alphonse Weil & Bros., New York or to his or their assigns." That bill of lading also contained the following: " Through bill of lading to New York via Havre. This bill of lading must be presented to the agents of the steamer Cie. Gie. Transatlantique French Line, 8 Pearl Street, New York, E. U. A." The skins were forwarded to the port of Havre and delivered to the French Line on the twenty-seventh of March by Ramsay's Foreign Service, and it received from the French Line an ocean bill of lading, in the French language, acknowledging the receipt of the 931 bundles of skins to be shipped by the steamer *La Meuse* to New York, to be there delivered " to Alphonse Weil & Bros. or ————— order." The steamship arrived at the port of New York on the sixteenth of April, and on delivery of the skins to the assignor's custom house brokers it was then discovered that forty bundles of skins of the invoice value of $1,833.11 were missing; and they have never been found. The other shipment consisted of 188 bundles of skins which defendants delivered to Ramsay's Foreign Service in Paris on the 4th of April, 1917, receiving therefor a like shipping receipt or bill of lading, and Ramsay's Foreign Service likewise forwarded those skins and delivered them to the French Line at Havre and received a like ocean bill of lading for their transportation to New York by the steamship *Hudson* and delivery at New York " to Alphonse Weil & Bros. or ————— order." There is in evidence a French Line

bill of lading for the second shipment. It was delivered to the assignor's custom house brokers, Hull & Co., by the French Line at New York on June eleventh, and contains an indorsement signed by defendants on the reverse side, as follows: " Please deliver to John A. Hull & Co.," and likewise an indorsement by John A. Hull & Co., evidently made as a receipt to the French Line for the goods. On the arrival of the *Hudson* at New York on the 2d of June, 1917, the goods were entered at the customs house and delivered to said brokers for the assignor, and it was then discovered that seventeen bundles of skins of the invoice value of $825.39 were missing and they likewise have never been found. The French Line's bill of lading for the first shipment contains a provision as follows: " Weighing to be done under supervision of Alph. Weil & Bros., 81 Fulton Street, New York; " but its bill of lading for the second shipment contained no such provision.

On the date of the contract and as therein provided, the assignor caused a letter of credit to be issued by Brown Bros. of Boston in favor of the defendants in Paris, " by the terms of which drafts for said shipment were to be drawn at 90 days sight against cost of merchandise, insurance, including war risk, freight charges, and bill of lading to accompany the draft," and on that day defendants at New York notified their Paris house thereof by cable. On receiving the first shipping receipt or bill of lading from Ramsay's on the fifteenth of March, defendants at Paris drew their draft on Brown Bros. for the amount of the invoice of goods so shipped to the order of Lehideux & Co., bankers in Paris, at ninety days' sight, and delivered the same together with the Ramsay bill of lading indorsed by them in blank to Lehideux & Co., who discounted the draft and paid the proceeds thereof to the defendants. On the same day defendants forwarded from Paris to the assignor their invoice for the goods so shipped with a letter stating that they had drawn their ninety days' draft against the letter of credit for the amount of the invoice. On the 7th of April, 1917, which was before the steamer arrived, Lehideux & Co., through New York bankers, caused to be presented to Brown Bros. the draft, the Ramsay bill of lading and consular invoice, and Brown Bros. accepted the draft and

received the bill of lading and invoice; but it does not appear
that any policy or certificate of insurance was delivered to
them or whether or not they requested it. The French Line
bills of lading were issued in triplicate, one of which was
forwarded to the defendants at New York and the other two
were retained by Ramsay's Foreign Service, but none was
delivered to Brown Bros. or to the assignor. The evidence
tends to show that there were former similar transactions
between the parties, and that without requiring the delivery
of the bill of lading issued by the ocean carrier, the assignor
looked to defendants to obtain delivery of the goods on their
arrival at New York. On the eighteenth of April defendants
wrote the assignor from New York that the steamship con-
taining the first shipment had arrived, and requested it to
forward any shipping documents it might have in order that
the defendants might make the necessary United States
customs entry. On the twentieth of April the assignor replied
that the documents covering the first shipment were in the
hands of John A. Hull & Co., who had instructions in regard
to forwarding the goods to it. Prior to the seventeenth of
April, Brown Bros., at the request of the assignor, had for-
warded to said Hull & Co., who were customs house brokers
in New York, the documents which they had for this shipment.
with instructions to obtain the delivery to Brown Bros., and
thereafter the customs house brokers delivered the documents
to the defendants who made the necessary customs house
entry and gave to the brokers their order for the delivery of
the skins, and on that they obtained the goods. On the
sixth of July, that year, Brown Bros. honored their acceptance
by paying the draft and were reimbursed therefor by the
assignor, who also paid them the usual banker's commission
of four dollars and fifty-eight cents. The same course was
followed by the defendants in drawing and obtaining the
discount of their draft for the amount of the second invoice,
and that draft was presented to and accepted by Brown Bros.
on the twenty-eighth of May, and they received with it only
the Ramsay bill of lading indorsed by defendants in Paris and
the consular invoice. No ocean bill of lading for the second
shipment was ever delivered to Brown Bros.; but they likewise
forwarded the shipping documents in their hands with respect

to the second shipment to said Hull & Co. with instructions to obtain the delivery of the goods for them. Hull & Co., with those documents and the bill of lading which they received from the French Line, indorsed by defendants, as already stated, made the necessary customs house entry with respect to the second shipment and received the goods for Brown Bros. Brown Bros. honored their acceptance of the second draft by paying the same on the twenty-eighth of August, and were reimbursed by the assignor who paid their banker's commission of two dollars and six cents.

Answering the complaint for repayment of the amount paid as the purchasing price of the skins which were lost, the defendants contend that title passed to the assignor on delivery of the skins to Ramsay's Foreign Service and that from that time the risk was with the assignor; and they also allege, in effect, an accord and satisfaction by an assignment of any claim they may have had against the French Line to and an acceptance thereof by the assignor. The facts upon which that defense is predicated have no bearing on the cause of action with respect to the second shipment, for they relate only to a claim made by the defendants against the French Line on account of the first shipment. On the 21st of November, 1917, the attorneys for the assignor wrote the defendants that the assignor had placed in their hands the claim for the shortage of the forty bundles of skins, saying that they understood that the defendants had presented to the French Line a claim covering the goods and that it had been approved but not yet paid, and that, inasmuch as the proceeds of the claim should ultimately be turned over to the assignor, they asked for a letter from the defendants to the French Line requesting that payment be made to the assignor; but they therein stated that it must be understood that such request was not to be deemed a waiver of any claim which the assignor had against the defendants; and on the thirtieth of the same month the attorneys again wrote, the defendants, referring to their letter of the twenty-first and stating that they had received no acknowledgment or reply, and asking for a statement of the attitude of the defendants in the premises. The defendants answered both letters December first, stating that the matter was in the hands of their attorney, who had been absent, but would

reply at an early date , On the third of December one of the attorneys for the assignor answered that letter, expressing surprise that defendants had deemed it necessary to submit the matter to counsel, and asking that they comply at once with the request for an assignment of the claim or an order on the French Line to pay the assignor. One of the attorneys for the defendants answered that letter on December fifth, stating that he would advise the defendants to send a letter addressed to the French Line requesting that it make the payment in settlement of the claim of the defendants to the assignor, and that, as he understood it, by virtue of the c. i. f. contract, the goods having been insured, title thereto passed to the assignor on delivery of the bill of lading, and the assignor was entitled to any sum that might be paid by the French Line, and that the reason for the delay in complying with the request of the attorneys for the assignor was that the defendants understood that the assignor made a claim against them; and he also stated that he had advised defendants that the assignor had no claim against them and that he would prepare a letter to the French Line at once and have defendants sign and forward it. On the seventh of December the attorney for the defendants, who wrote the former letter, wrote one of the attorneys for the assignor, stating that he inclosed a letter from the defendants to the French Line asking it to pay the claim for shortage to the assignor, and that he would forward the bill of lading as soon as he received it from the defendants. The letter from the defendants to the French Line, so inclosed, referred to their claim for $2,124.80 covering the forty bundles of calfskins short on the *La Meuse*, and stated that the goods were owned by the assignor and that they had made the claim as its agents, and requested that the proceeds of the claim be paid to the assignor. That letter was never returned to the defendants. The attorneys for the assignor presented it to the claim agent of the French Line, who refused to pay the defendants' claim against the Line and stated that the line recognized its liability to the defendants under the bill of lading only " for an infinitesimal amount — as per the bill of lading."

It was stipulated that prior to the commencement of the action, the E. C. Mills Leather Company duly assigned each

of the causes of action to the plaintiff, but the date thereof was not given.

Defendants called their general manager, who testified that c. i. f. meant the cost of the invoice, insurance against marine perils and the payment of freight, and that when a bill of lading is delivered showing that a certain quantity of goods had been forwarded, that the freight has been prepaid, and an insurance certificate showing that insurance against marine perils has been paid is also delivered, the shipper has performed his part of the contract. In the discussion between the court and counsel which then followed, counsel for the defendants claimed that upon the delivery to Brown Bros. of the bill of lading, the title to the goods passed to the assignor. It does not appear that plaintiff made any claim that a certificate of insurance was not obtained or delivered at the same time or that by a failure to deliver a certificate of insurance, defendants were not entitled to the benefit of the contract as a c. i. f. contract. The record only shows that plaintiff claimed that the French Line bill of lading should have been delivered and that title to the goods did not pass to the assignor until its delivery and until it had possession of the muniments of title, which he claimed was not until after the goods had arrived and the loss had been sustained.

The president of the assignor was called by the plaintiff and testified that he was not aware as to whether there was a practice or custom by which the French Line would, on the Ramsay bill of lading, without production of its own bill of lading, deliver the goods so shipped, where, as here, with respect to the first shipment, the French Line bill of lading contained a notation that the goods were to be weighed at New York under the supervision of the shipper. A representative of Hull & Co., the customs brokers, called by the defendants, testified that the United States customs authorities did not enter goods on a Ramsay bill of lading, and that when his firm receives such a bill of lading it is taken to the French Line, and there a French Line bill of lading is filled out and used to make the entry, and if the French Line does not happen to have a bill of lading, they stamp a notation on the Ramsay bill of lading which answers the purpose, and on a Ramsay bill of lading so stamped, the goods are thus obtainable without

application to the defendants; and that notwithstanding the notation providing that the weighing is to be under the supervision of the defendants, the French Line will deliver and, under such circumstances, has customarily made deliveries for years without having defendants appear to supervise the weighing; but that if the bill of lading issued by the French Line was in the hands of a party not entitled to delivery under the Ramsay bill of lading, then a duplicate of the French Line bill of lading would not be given by it for the purpose of making the customs house entry. At the instance of the court, Mr. Cauchois, the general agent of the French Line, was called as a witness. He testified that on French Line bills of lading, such as those here involved, running directly to the defendants, which makes them straight bills of lading as distinguished from order bills of lading, for the reason that the blank before the word " ordre " was not filled out, defendants could make the customs house entry and pay the duty, and the customs house would give them a permit to obtain the goods; but that the presentation of the Ramsay bill of lading did not entitle the holder to obtain the goods from the French Line or to a French Line bill of lading duplicate, for the reason that the French Line bill of lading ran to the defendants, and, therefore, the goods would only be delivered to them, but that the notation with respect to the weighing being under the supervision of the defendants had no effect on the delivery, for that is not made a condition before delivery. Defendants also showed by the testimony of a broker, who had extensive experience with Ramsay's Direct Foreign Service for upwards of twenty years, that the Ramsay order bills of lading for through shipments are recognized as negotiable by the French banks. The general manager of the defendants also testified that in 1917 the French government did not permit merchandise, and particularly hides and skins, to be exported excepting on a license issued by it, and that the defendants' license, which was a general one, was procured by its Paris house and provided that all merchandise coming to the United States had to be consigned to the defendants, and that the license was lodged in Havre, and that, therefore, the French Line's bill of lading had to be made out as were those here under consideration, and that this was well understood by

all who purchased goods from the defendants. That testimony stands uncontroverted and it must, therefore, be assumed that the assignor understood that French Line straight bills of lading consigning the skins to the defendants were to be obtained. The parties erroneously stipulated that the blanks in the French Line bills of lading were filled out making them order bills of lading, but that is disproved by the bills of lading and by uncontroverted testimony to which no objection was interposed. I think the point is not material to a decision of the appeal, but if it were, we would be obliged to hold that they were straight bills of lading.

The learned counsel for the appellant urges three points as grounds for reversal, viz.: (1) That in the circumstances the order on the French Line delivered by the defendants to the assignor, which has not been returned, constituted an accord and satisfaction; (2) that this was a c. i. f. contract and, therefore, upon the delivery of the documents to Brown Bros., title passed to the buyer and it assumed all risk as of the time of the delivery of the goods to the carrier; and (3) that if the defendants, owing to their failure to deliver the French Line bills of lading to Brown Bros. on presentation of the drafts are not entitled to have the contract deemed a c. i. f. contract, in any event, title passed to the buyer on the delivery of the Ramsay bills of lading to Lehideux & Co., when the drafts were discounted, for presentation of the drafts and delivery of the bills of lading to Brown Bros. *or* upon presentation of the drafts and delivery of the Ramsay bills of lading to Brown Bros.

As already observed, the alleged accord and satisfaction relates only to the first shipment; but even as to that I deem it quite clear that there was no accord and satisfaction. The assignor, expressly, without prejudice to its claim against the defendants, requested the order for the payment to be made directly to it by the French Line in settlement of the claim for the first shipment which the defendants had made against the French Line, and that payment was not made, and the French Line disclaimed anything more than a nominal liability. Since the French Line did not pay the claim and there was no formal assignment of it by the defendants to the assignor, but merely an order or direction to the French Line

to make the payment to the assignor, and there was no agreement that the order was to be in settlement and discharge of any claim the assignor had against the defendants, and the French Line refused to accept the order or make the payment, there was no accord or satisfaction of any claim the assignor had against defendants, and it remained free to assert the claim precisely as if the order had not been given. (*Moers* v. *Moers*, 187 App. Div. 653; 191 id. 888; 229 N. Y. 294.)

Counsel for the respondent contends that even though the parties intended that the agreement should constitute a c. i f. contract, defendants are not entitled to the benefit thereof as such, for the reason that they did not perform the obligation on that theory resting upon them of presenting to Brown Bros., with the draft, the necessary documents to enable the assignor to obtain the goods if they arrived, and to enable it to assert any claim there might be against the French Line, and to obtain the insurance in case of a loss covered thereby. No point is made of the failure of the defendants to deliver to Brown Bros. a policy or certificate of insurance covering each shipment and that only as required under a c. i. f. contract (*Manbre Saccharine Co., Ltd.,* v. *Corn Products Co., Ltd.,* L. R. [1919] 1 K. B. 198), and since that point was not taken on the trial, I think it should not, even if it were urged, avail the respondent now, for, had it been taken on the trial, it might have shown that delivery of a proper policy or certificate of insurance was made or tendered to Brown Bros., or that the defendants were in a position to deliver it and that delivery was not insisted upon. It is strenuously urged, however, in behalf of the respondent, and was urged upon the trial, that defendants should have delivered to Brown Bros. or to the assignor a French Line bill of lading so indorsed by them as to enable the assignor to make the necessary customs house entry of the goods and to obtain delivery thereof from the French Line. The theory of a c. i. f. contract is that it constitutes a sale of goods by delivery not of goods but of documents, viz., a bill of lading, invoice and policy or certificate of insurance, and that it is incumbent upon the seller to deliver or to tender delivery of them to the buyer within a reasonable time after the date agreed upon for the shipment of the goods, and that on performance of that duty by the

seller it becomes the duty of the buyer to accept the documents which will entitle him to receive the goods if they arrive, and to enforce any claim of liability there may be either against the carrier or the insurer, and, therefore, in such cases it becomes immaterial in whom the title was, either at the time of or prior to the delivery or tender of delivery of the documents, and it likewise becomes immaterial whether the goods have been lost in transit before or are so lost after the delivery or tender of delivery of the documents (*Groom, Ltd.,* v. *Barber,* L. R. [1915] 1 K. B. 316; *Manbre Saccharine Co., Ltd.,* v. *Corn Products Co., Ltd., supra; Ireland* v. *Livingston,* L. R. 5 H. L. 395, 406; *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19; *Mee* v. *McNider,* 39 Hun, 345; affd., 109 N. Y. 500; *Smith Co., Ltd.,* v. *Moscahlades,* 193 App. Div. 130.) In the case at bar the assignor, through its agents, Brown Bros., accepted the documents tendered as sufficient, and on their presentation and delivery accepted and paid the drafts, and it appears that it was understood that the French Line bills of lading were to be issued consigning the goods to the defendants, and that the defendants at all times after they received said bills of lading were in a position to deliver them to the assignor, and it is to be inferred that formal delivery or tender thereof was waived, and that the assignor in these instances as with respect to similar former shipments to it from the defendants, relied upon the defendants' rendering the necessary assistance after the arrival of the goods to enable it to obtain possession thereof; and, moreover, this was the attitude maintained by the defendants, as shown by the evidence, and the assignor had no difficulty with their volunteered assistance in obtaining possession of that part of the goods which arrived. I am of opinion, therefore, that if it had been intended by the parties that the agreement should constitute a strict c. i. f. contract, the failure of the defendants to deliver the French Line bills of lading to the assignor did not, in the circumstances, deprive them of the right to have the contract so construed. It is further contended by the respondent that, in view of the provisions of the contract guaranteeing a minimum shrinkage on the skins being weighed on arrival at New York it should be held that it was contemplated that delivery to the purchaser should be made on the arrival of the goods there.

The evidence shows that, according to the custom of the business, that clause has no bearing on the delivery of the goods, and that in the event of a shrinkage in excess of the guaranteed amount an allowance is made to the purchaser. Therefore, it cannot be held that this clause shows that the agreement was not intended as a strict c. i. f. contract.

If all of the provisions of the contract were to be given full effect, then it might well be contended, as counsel for the respondent argues, that the contract contains provisions inconsistent with its having been intended as a strict c. i. f. contract and bringing it within the rule frequently announced by this court that the use of the abbreviation c. i. f. in such circumstances should be construed as having been used with reference only to the price to be paid by the purchaser and not with the intention of giving the agreement full effect as a c. i. f. contract. (See *Willits & Patterson* v. *Abekobei & Co., Ltd.,* 197 App. Div. 528; *Standard Casing Co., Inc.,* v. *California Casing Co., Inc.,* Id. 187; *Schopflocher* v. *Essgee Co. of China, Inc.,* Id. 781; *Pottash* v. *Cleveland-Akron Bag Co.,* Id. 763; *Boss* v. *Hutchinson,* 182 id. 88.) Here, however, the inspection of the contract, as already stated, shows that the only provisions thereof which are inconsistent with its being a strict c. i. f. contract were printed, and that the other material provisions were typewritten on the blank form of contract. In such circumstances the rule is well settled that the provision so inserted on a blank form of contract where inconsistent with the printed provisions thereof supersedes such printed provisions and is controlling (*Heyn* v. *New York Life Ins. Co.,* 192 N. Y. 1; *Collins* v. *Knuth,* 51 App. Div. 188; *Robertson* v. *Frohman, Inc.,* 198 id. 782); and with respect to the precise point now under consideration it has been held that the filling in in a blank form of contract of provisions indicating an intent that it was to be deemed a c. i. f. contract, even though inconsistent with the printed provisions thereof, govern. (*Law & Bonar, Ltd.,* v. *British-American Tobacco Co., Ltd.,* L. R. [1916] 2 K. B. 605.) I am, therefore, of opinion that the agreement for the purchase and sale of the skins was intended as a strict c. i. f. contract, and that the assignor waived a strict compliance therewith as such, as already pointed out, and that, therefore, the defendants fully performed their obligations when the

goods were delivered to the carrier and the bills of lading therefor and the insurance thereon were obtained, and they were ready, able and willing to deliver the same to the assignor, for in such circumstances the provisions of the Personal Property Law (§§ 100, 101, as added by Laws of 1911, chap. 571) which would otherwise apply, are not applicable; and the assignor must look solely to the French Line under the bills of lading for redress. In this view of the case it is unnecessary to consider the other point argued with respect to when title would have passed to the assignor if this were not a c. i. f. contract.

It follows, therefore, that the findings of fact and conclusions of law, inconsistent with these views, to be specified in the order, should be reversed and appropriate findings and conclusions of law in accordance herewith should be made, and that the judgment should be reversed, with costs, and the complaint dismissed, with costs.

CLARKE, P. J., SMITH, MERRELL and GREENBAUM, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs. Settle order on notice.